**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1054
_____

KEYSTONE REDEVELOPMENT PARTNERS, LLC

v.

THOMAS DECKER, MARY DIGIACOMO COLINS;
RAYMOND S. ANGELI, JEFFREY W. COY,
JOSEPH W. MARSHALL, III, KENNETH T. MCCABE,
and SANFORD RIVERS, all named in their individual
capacities as members of the Pennsylvania Gaming
Control Board in December, 2006; and GREGORY C. FAJT;
RAYMOND S. ANGELI; JEFFREY W. COY; JAMES B.
GINTY; KENNETH T. MCCABE; SANFORD RIVERS and
GARY A. SOJKA, all named in their official capacities as
current members of the Pennsylvania Gaming Control Board

v.

HSP GAMING, L.P.
(Intervenor in District Court)

Thomas Decker, Mary DiGiacomo Colins,
Raymond S. Angeli, Jeffrey W. Coy, Joseph W. Marshall III,
Kenneth T. McCabe and Sanford Rivers,

Appellants

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(Civil Action No. 08-CV-2265)

District Judge: Honorable John E. Jones III
_____

Argued
November 16, 2010

Before: AMBRO, FISHER, and GARTH, <u>Circuit Judges</u>

(Opinion filed : January 7, 2011)

David R. Overstreet, Esq. (Argued)
John P. Krill, Jr., Esq.
Abram D. Burnett, III, Esq.
Anthony R. Holtzman, Esq.
K&L Gates LLP
17 North Second Street, 18th Floor
Harrisburg, PA 17101
        <u>Counsel for Appellee</u>

James J. Kutz, Esq.
Barbara A. Zemlock, Esq.
John W. Dornberger, Esq.
Post & Schell, P.C.
17 North 2th Street, 12th Floor
Harrisburg, PA 17101

R. Douglas Sherman, Esq.
Pennsylvania Gaming Control Board
303 Walnut Street/Strawberry Square
Verizon Tower, 5th Floor
Harrisburg, PA 17101

Ralph G. Wellington, Esq. (Argued)
Nancy Winkleman, Esq.
Joseph Anclien, Esq.
Joseph J. Langkamer, Esq.
Schnader Harrison Segal & Lewis, LLP
1600 Market Street, Suite 3600

Philadelphia, PA 19103
        Counsel for Appellants

William H. Lamb, Esq.
Scot R. Withers, Esq.
Lamb McErlane, PC
24 East Market Street
P.O. Box 565
West Chester, PA 19381

Stephen A. Cozen, Esq.
F. Warren Jacoby, Esq.
Jennifer M. McHugh, Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Thomas E. Groshens, Esq. (Argued)
Richard A. Sprague, Esq.
Thomas A. Sprague, Esq.
Charles J. Hardy, Esq.
Sprague & Sprague
Wellington Building.
135 South 19th Street
Philadelphia, PA 19103
        Counsel for Intervenor-Appellant HSP Gaming, L.P.

Barbara Adams, Esq.
Gregory Dunlap, Esq.
33 Market Street, 17th Floor
Harrisburg, PA 17120
        Counsel for Amicus Edward G. Rendell, Governor of
Pennsylvania

_____

OPINION OF THE COURT
_____

GARTH, Circuit Judge

In this appeal, we consider whether the former members of the Pennsylvania Gaming Control Board are immune from suits brought against them in their individual capacities based on their decisions to grant gaming licenses to certain applicants other than appellee Keystone Redevelopment Partners, LLC (Keystone). We conclude that they are entitled to absolute, quasi-judicial immunity. Accordingly, we will reverse the decision of the District Court.

I.

In 2004, the Pennsylvania General Assembly enacted the Pennsylvania Race Horse and Gaming Act, 4 Pa. Cons. Stat. §§ 1101-1906, which created the Pennsylvania Gaming Control Board ("Gaming Board" or "Board") to license a limited number of gaming entities within the Commonwealth. 4 Pa. Cons. Stat. §§ 1201, 1202. The Gaming Board is comprised of seven voting members,[1] three of whom are appointed by the Governor and four of whom are appointed by four different members of the General Assembly. Id. § 1201(b). The voting members serve fixed terms of office -- three years for gubernatorial appointees, two years for legislative appointees -- and may only be removed for "misconduct in office, willful neglect of duty or conduct evidencing unfitness for office or incompetence," or a

---

[1] Three *ex officio* members -- the Secretary of Revenue, Secretary of Agriculture, and the State Treasurer -- also sit on the Board, but are not permitted to vote. Id. § 1201(e).

conviction for certain criminal offenses. Id. § 1201(b.1), (d). They are prohibited from political activity and from making or soliciting political contributions. Id. § 1202.1(c)(5).

The Gaming Board's procedure for considering license applications is governed by express statutory and regulatory guidelines, which include the following:

- Before conducting a licensing hearing, the Board must hold at least one public input hearing at which witnesses may testify and the opportunity for public comment is afforded. Id. § 1205(b).

- A licensing hearing is held for each of the applicants. The Board must give notice of the hearing to the parties, 2 Pa. Cons. Stat. § 504, and make a schedule of the hearings available to the public, 58 Pa. Code § 441a.7(a).

- The Bureau of Investigations and Enforcement (BIE), an agency created by, but independent from, the Board, 4 Pa. Cons. Stat. § 1202(b)(25), performs background checks on each applicant and delivers a report to the Board "relating to the applicant's suitability for licensure," id. § 1517(a.1)(2).

- A member of the Board must "[d]isclose and recuse himself from any hearing or other proceeding in which the member's objectivity, impartiality, integrity or independence of judgment may be reasonably questioned due to the member's relationship or association with a party connected to any hearing or proceeding or a person appearing before the board." 4 Pa. Cons. Stat. § 1202.1(c)(3). In addition, no member may engage in *ex parte* communication regarding a pending matter. Id. § 1202.1(c.1). However, § 1202.1(e) defines "*ex parte* communication" to exclude "off-the-record communications by or

5

between a member or hearing officer of the board . . . prior to the beginning of the proceeding solely for the purpose of seeking clarification or correction to evidentiary materials intended for use in the proceedings," as well as "communications between the board or a member and the office of chief counsel" of the BIE.

- At least thirty days before the initial license hearing, each applicant must file with the Board, and serve on all other applicants for the same license, "a memorandum identifying all evidence it intends to use in support of its presentation before the Board," 58 Pa. Code § 441a.7(i), including any materials about which an expert witness will testify, id. § 441a.7(i)(4). Evidence that has not been identified in that manner may only be admitted later: 1) in response to a request from the Board, id. § 441a.7(m)(1); 2) "if the issue could not have been reasonably anticipated by the applicant," id. § 441a.7(m)(2); or 3) to "present evidence which sets forth a comparison between the applicant and other applicants within the same category with respect to the standards and criteria" for receiving a license, id. § 441a.7 (n).

- At the licensing hearing,

  o the applicant has a right to counsel, 2 Pa. Cons. Stat. § 502;

  o the Board may subpoena documents and witnesses, 4 Pa. Cons. Stat. § 1202(b)(7);

  o the applicant may present documentary and testimonial evidence, 58 Pa. Code § 441a.7(i);

  o all witnesses must be sworn, id. at § 441a.7(q);

6

o the Board or Chief Enforcement Counsel, an agent of the BIE, may examine or question the applicant or applicant's witnesses, id. § 441a.7(p); and

o the record must be transcribed, id. § 441a.7(v).

- Although there is no opportunity to cross-examine competitors' witnesses, an applicant may raise objections to competitors' hearings, id. § 441a.7(t), and, after filing notice with the Board and on the competitors, present evidence comparing its application to those of competitors, id. § 441a.7(n). In addition, after submitting their applications, applicants are given the opportunity to make final oral remarks before the Board, id. § 441a.7(w), and file a post-hearing brief addressing competitors' applications for the license, id. § 441a.7(u).

- The Board must grant licenses to the applicants who best demonstrate, by clear and convincing evidence, their suitability for licensure based on certain enumerated factors, id. § 441a.7(d), which relate generally to: (a) the location and quality of the proposed facility; (b) the potential for economic development and new job creation, especially for Pennsylvania residents; (c) a plan for diversity in employment and contracting, (d) the history of the applicant in developing tourism facilities, meeting commitments to local agencies and community-based organizations, dealing with its employees, and complying with the law; and (e) the degree to which potential adverse effects on the public resulting from the project will be mitigated. 4 Pa. Cons. Stat. § 1325(c).

- The Board must issue a final order and written decision, 58 Pa. Code § 441a.7(x), which contains

factual findings and the reasons for the Board's determination, 2 Pa. Cons. Stat. § 507. Unsuccessful applicants have the right to appeal to the Pennsylvania Supreme Court. 4 Pa. Cons. Stat. § 1204; 58 Pa. Code § 441a.7(y).

## II.

In December 2005, appellee Keystone was one of five entities to apply for one of two Category 2 slot-machine licenses available for the City of Philadelphia. After holding public and licensing hearings for each applicant, at a December 20, 2006, public meeting, the Gaming Board unanimously voted to grant licenses to Foxwoods and to intervenor HSP Gaming, and to deny the other three entities' applications, including Keystone's. The Board detailed its factual findings and offered the reasons for its votes in a 113-page written decision.

In discussing one of the multiple factors weighing against Keystone's application, the Board explained as follows:

> The evidentiary record establishes that Keystone's parent company, Trump Resorts, owns three Atlantic City casinos . . . . [Competitors] HSP/Sugarhouse, Riverwalk and Philadelphia Entertainment/Foxwoods do not own or control any Atlantic City properties. The Board has considered the fact of competing Atlantic City properties as a negative factor for licensure in Philadelphia. While the Board believes that each applicant desires to make a profit in

8

Philadelphia if granted a license, the Board also is cognizant of its duty to license casinos in Philadelphia which are in the best interests of the Commonwealth and Philadelphia. The Board finds it credible that owners of casinos in both locations may attempt to use the Philadelphia property as a gambling-incubator to gain new customers who will then be lured to its Atlantic City properties where it can earn a much higher profit on every dollar gambled [due to the lower tax rate]. Likewise, the Board finds applicants without Atlantic City connections are more strongly motivated to compete directly against the Atlantic City competition because they have no interest in diverting patrons to the casino which has a better tax structure for the casino. Additionally, evidence has been introduced that the Trump Entertainment properties in Atlantic City have undergone bankruptcy organizations in order to rebuild and revitalize them. The Board believes this further supports its decision to choose other applicants who do not have other facilities so close to Philadelphia which may lure patrons to Atlantic City to assist in the rebuilding and revitalization of properties there. Therefore, the

> Board finds that licensing casinos in Philadelphia which do not have common ownership with Atlantic City facilities are more likely to further the interests of the Commonwealth and the public which stands to benefit through increased revenues obtained by the Pennsylvania properties.

(App. 194-95.) Ultimately, while the Board found that each of the applicants was "eligible and suitable for licensure under the terms of the [Race Horse and Gaming] Act," it concluded that Foxwoods and HSP Gaming "were the applicants which possessed the projects which the Board evaluated, in its discretion, to be the best projects for licensure under the criteria of the Act." (App. 101.)

Only one of the unsuccessful applicants, Riverwalk Casino, LP, exercised its statutory right to appeal to the Pennsylvania Supreme Court. The Court affirmed the order of the Gaming Board, holding, among other things, that the Board "serves as a quasi-judicial body with fact-finding and deliberative responsibilities." Riverwalk Casino, LP v. Pa. Gaming Control Bd., 926 A.2d 926, 935 (Pa. 2007).

On March 18, 2009, Keystone filed an amended complaint in the District Court for the Middle District of Pennsylvania against the members of the Gaming Board -- those currently serving, in their official capacities, in addition to those serving on December 2006, in their individual capacities -- seeking relief under 42 U.S.C. § 1983 for alleged violations of its constitutional rights under the Commerce Clause of Article I, Section 8, the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment. Keystone asserted that the Gaming Board had reached its licensing determination based on an illegally discriminatory consideration, namely, that Keystone, due to its operation of

10

gaming facilities in Atlantic City, might divert commerce to New Jersey rather than foster local economic interests. Keystone demanded relief in the form of declaratory, injunctive, and monetary relief and attorneys' fees.

On March 27, 2009, the Gaming Board defendants and intervenor HSP Gaming moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the basis that, inter alia, the Board members were entitled to quasi-judicial immunity (absolute immunity) or, in the alternative, qualified immunity. In a December 16, 2009, Memorandum and Order, the District Court dismissed Keystone's claims against the current Gaming Board members on ripeness grounds, but denied the motions to dismiss with respect to Keystone's claims against the former Board members.2 Keystone Redev. Partners, LLC v. Decker, 674 F. Supp. 2d 629, 668 (M.D. Pa. 2009).

In first addressing the Board Defendants' invocation of quasi-judicial immunity, the District Court declined to defer to the Pennsylvania Supreme Court's determination in Riverwalk Casino that, based on state case law, the Gaming Board is a quasi-judicial body. Id. at 657. Instead, the District Court found that, based on the factual averments contained in Keystone's complaint, the Board's hearings, while akin to judicial proceedings in certain respects, appeared to lack some indicia of adversarial contests -- in particular, prohibitions on *ex parte* communications, opportunities for cross-examination, and the ability to challenge proffered evidence. Id. at 659. Therefore, the Court held that without development of an evidentiary record,

---

[2] Throughout this opinion, for ease of reference, we collectively refer to the members of the former Board and intervenor HSP Gaming as "Board Defendants."

11

it could not resolve the question of quasi-judicial immunity. Id.

Turning to the issue of qualified immunity, the Court concluded that Keystone, by alleging that the Board Defendants had deliberately favored local interests at the expense of out-of-state competitors, had sufficiently pled violations of "clearly established rights" protected under the Constitution's Commerce Clause and the Equal Protection Clause for which relief could be granted. Id. at 660-67. Accordingly, the Court held that the Board Defendants were not entitled to qualified immunity, and denied their motions to dismiss Keystone's complaint on those grounds. Id. at 667-68.

The Board Defendants appealed to this Court for review of the District Court's denial of their motion to dismiss on the basis of quasi-judicial and/or qualified immunity.

III.

We have jurisdiction over the order denying official immunity under the collateral order doctrine of 28 U.S.C. § 1291. Dotzel v. Ashbridge, 438 F.3d 320, 324 (3d Cir. 2006) (citing Mitchell v. Forsyth, 472 U.S. 511, 526-27 (1985), among others).

When considering an appeal from a denial of a motion to dismiss, this Court exercises plenary review, accepting as true "[t]he facts alleged in the complaint and the reasonable inferences that can be drawn from those facts." Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006). In considering the propriety of the District Court's ruling, this Court "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing the record of the case." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994).

12

## A.

Quasi-judicial immunity attaches to public officials whose roles are "'functionally comparable' to that of a judge." Hamilton v. Leavy, 322 F.3d 776, 785 (3d Cir. 2003) (quoting Butz v. Economou, 438 U.S. 478, 513 (1978)). Such immunity "flows not from rank or title or location within the Government, but from the nature of the responsibilities of the individual official." Cleavinger v. Saxner, 474 U.S. 193, 201 (1985) (citation and internal quotation marks omitted). Thus, in evaluating whether quasi-judicial immunity grants immunity to a particular official, a court inquires into "the official's job function, as opposed to the particular act of which the plaintiff complains." Dotzel, 438 F.3d at 325; Gallas v. Supreme Court of Pa., 211 F.3d 760, 769 (3d Cir. 2000) ("[O]ur analysis must focus on the general nature of the challenged action, without inquiry into such 'specifics' as the [official's] motive or the correctness of his or her decision." (citing Mireles v. Waco, 502 U.S. 9, 13 (1991))).

In Cleavinger, the Supreme Court offered a non-exhaustive list of six factors "characteristic of the judicial process" that it had identified in Butz as relevant to a determination of whether an official enjoys quasi-judicial, and thus absolute, immunity:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary

13

> nature of the process; and (f) the
> correctability of error on appeal.

474 U.S. at 202 (citing Butz, 438 U.S. at 512). This Court has accordingly adopted the Butz factors outlined in Cleavinger as the touchstones of its quasi-judicial immunity inquiry. Dotzel, 438 F.3d at 325-37 (holding that members of a municipal board of supervisors were immune from suit brought against them in their official capacities).

Dotzel's analysis, which is informed by the instructions of Butz and Cleavinger, as we are, has the same application to the Pennsylvania Gaming Control Board as it did to the Dotzel zoning officials. There can be no distinction among them when applying the Butz factors.[3] We therefore

---

[3] The distinction that Judge Fisher, our dissenting colleague, draws between adjudicating *rights* and adjudicating *privileges* is untenable for two reasons.

First, the zoning board in Dotzel was sued for its decision to deny a conditional-use permit, which, if granted, confers on the grantee a *license*, not a *right*, to use her land in a particular fashion. The denial of that license in Dotzel, a determination that we believed warranted quasi-judicial immunity, is no different from the denial of a license to operate slot machines that gives rise to this case.

Second, federal courts have uniformly concluded that state licensing bodies charged with deciding whether to award discretionary licenses are entitled to quasi-judicial immunity. Burnett v. McNabb, 565 F.2d 398, 400 (8th Cir. 1977) (County Beer Board granting conditional beer license); Kraft v. Jacka, 669 F. Supp. 333, 337 (D. Nev. 1987) (State Gaming Commission denying gaming license); Hamm v. Yeatts, 479 F. Supp. 267, 271-72 (W.D. Va. 1979) (State Alcoholic Beverage Commission denying beer license); Brown v. DeBruhl, 468 F. Supp. 513, 519 (D.S.C. 1979)

14

analyze the quasi-judicial immunity question in this case by applying the Butz factors.

### 1. The need to assure that the function can be performed without harassment or intimidation

In Butz, the Supreme Court recognized that administrative law judges, like other judges, must be extended quasi-judicial immunity so that they "can perform their respective functions without harassment or intimidation" from dissatisfied parties, such as "an individual targeted by an administrative proceeding [who] will act angrily and may seek vengeance in the courts," or a "corportation [that] will muster all of its financial and legal resources in an effort to prevent administrative sanctions." 438 U.S. at 512, 515. In Dotzel, we concluded that members of a municipal board of governors, as arbiters of local zoning disputes, would be subject to those same risks of harassment and intimidation. As we explained,

> zoning disputes can be among the most fractious issues faced by municipalities, and the risk of threats and harassment is great. The monetary stakes are often quite high, especially in commercial cases like this one, making the possibility of liability an especially potent adversary of objectivity. . . . "[T]he public interest requires that persons serving on planning boards considering applications for

(State Alcohol Beverage Control Commission denying liquor license).

15

> development act with
> independence and without fear
> that developers, who will
> frequently have significant
> financial resources and the ability
> to litigate, not bring them to court.
> The possibility of facing
> expensive litigation as a result of
> making a decision on an
> application for development may
> in a subtle way impact on the
> decision making process."

438 F.3d at 325-26 (quoting Bass v. Attardi, 868 F.2d 45, 50 n.11 (3d Cir. 1989)).

Keystone argues that the Board Defendants are not subject to a significant risk of harassment and intimidation because they can only deprive applicants of financial opportunities, not liberty or property interests, and they can only award a limited number of licenses, which reduces the number of potentially vindictive, disappointed applicants. The Board Defendants, pointing to the four suits that have been brought against the Gaming Board arising from its December 2006 licensing decision, assert that gaming license applicants' extensive financial resources make them more likely to initiate subsequent litigation to hold Board members liable for an adverse licensing ruling.

We conclude that this factor weighs in favor of immunity for the Board Defendants. The financial interests at stake are extremely large: all applicants must be able to afford a $50 million license fee, 4 Pa. Const. Ann. § 1209(a), and each of the December 2006 applicants had annual revenues in excess of $300 million. Keystone itself spent $10 million alone on its application, and in its presentation to the Gaming Board, it unveiled plans for a $444.8 million gaming project. After Keystone lost out on the license, it initiated three

16

separate lawsuits, including this one. "'When millions may turn on regulatory decisions [as in this case], there is a strong incentive to counter-attack.'" Butz, 438 U.S. at 515 (quoting Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst., 566 F.2d 289, 293 (D.C. Cir. 1977)). It is plain that, much as in Dotzel, "the monetary stakes are . . . high," the applicants "have significant financial resources and the ability to litigate," and thus "[t]he possibility of facing expensive litigation as a result of making a decision on an application . . . may in a subtle way impact on the decision making process." 438 F.3d at 325-26.

Our conclusion regarding this factor is buttressed by the reasoning of the District Court of Nevada, which, in holding that absolute immunity extended to members of the Nevada Gaming Control Board against claims arising from their licensing decisions, aptly described the unique concerns of retaliation facing members of a gaming licensing commission:

> In this important area of public interest where the decisions made by these individuals often involve millions of dollars and the reputation of a whole state, there is a danger that a person who receives an adverse decision will retaliate and seek vengeance in the courts. The discretion and judgment of these officials in initiating administrative proceedings and in deciding matters of great public importance might be affected if their immunity from damages arising from those decisions was less than complete.

17

Kraft v. Jacka, 669 F. Supp. 333, 337 (D. Nev. 1987) (quoting Rosenthal v. State of Nevada, 514 F. Supp. 907, 914 (D. Nev. 1981)) (internal citations and quotation marks omitted). Those concerns are equally applicable to the Pennsylvania Gaming Control Board, and we are satisfied that the Board Defendants cannot exercise their judgment without fear of intimidation if their immunity from personal liability is not assured.

## 2. The presence of institutional safeguards against improper conduct

In fashioning the prevalence of the factors pronounced by Butz, the more the activity looks judicial, the more weight is to be given to officials' freedom from personal liability.

In Butz, the Supreme Court opined that a finding of immunity for administrative judges was supported by the fact that "agency adjudication contain[s] many of the same safeguards as are available in the judicial process," noting in particular that "[t]he proceedings are adversary in nature"; "they are conducted by a trier of fact insulated from political influence"; "[a] party is entitled to present his case by oral or documentary evidence"; "the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision"; "[t]he parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record"; and the administrative judge "may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions." 438 U.S. at 513. These safeguards were found to be present in Dotzel, just as they are relevant here. In particular, in Dotzel there were requirements for (1) notice to the parties and the public, (2) public hearings, (3) specific procedures for conducting hearings, (4) the right to counsel, (5) the use of subpoenas and oaths, (6) the issuance of written decision, and (7) the preparation of transcripts. 438 F.3d at 326.

18

Here, consistent with <u>Butz</u> and <u>Dotzel</u>, the Gaming Board must (1) give notice to the parties, 2 Pa. Cons. Stat. § 504, and the public, 58 Pa. Code § 441a.7(a); (2) hold public-input hearings, 4 Pa. Cons. Stat. 1205(b); and (3) abide by specific procedures for conducting hearings, 58 Pa. Code § 441a.7; (4) the applicants are entitled to counsel, 2 Pa. Cons. Stat. § 502; (5) the Board may subpoena witnesses and documents, 4 Pa. Cons. Stat. § 1202(b)(7), and accept only sworn testimony, 58 Pa. Code § 447(q); (6) the Board must issue a written decision, <u>id.</u> § 441a.7(x); and (7) the record must be transcribed, <u>id.</u> § 447(v). This factor weighs in favor of immunity for the Board Defendants, just as it did for the public officials in <u>Dotzel</u>.

### 3. The degree of insulation from political influence

The <u>Butz</u> Court deemed probative to the question of immunity whether the process of adjudication at issue "is structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency." 438 U.S. at 513.

Voting members of the Gaming Board serve fixed terms, 4 Pa. Cons. Stat. § 1201(d); may only be removed for "misconduct in office, willful neglect of duty or conduct evidencing unfitness for office or incompetence," or a criminal conviction, <u>id.</u> § 1201(b.1); are prohibited from political involvement, <u>id.</u> § 1202.1(c)(5); and must recuse themselves if their impartiality is called into question, <u>id.</u> § 1202.1(c)(3). Keystone points out that the *ex officio* members of the Gaming Board (the Pennsylvania Secretary of Revenue, Secretary of Agriculture, and Treasurer) are by definition not barred from political activity. The statutory scheme, however, mitigates any impropriety by denying those members -- as distinct from the voting members -- the ability to vote in licensing decisions. <u>Id.</u> § 1201(e). Accordingly, we conclude that the Board is adequately insulated from

19

political pressures, thereby satisfying this element of quasi-judicial immunity.4

### 4. The use of precedent in resolving controversies

Although the <u>Butz</u> Court did not expound on the application of this factor, this Court in <u>Dotzel</u> inferred "the relevant question . . . to be whether the Board's decisions are purely discretionary, or are constrained by outside law." 438 F.3d at 326-27. Since it was "not clear to what extent the Board refers to its own prior determinations in reaching decisions," the <u>Dotzel</u> Court instead considered the fact that "the Board is required by statute to consider in its deliberations the land-use standards set out in the relevant zoning ordinance, and to explain its reasoning in written opinions," as decisive of this factor. <u>Id.</u> at 327.

The Board Defendants' brief recognizes that the Board Defendants did not rely on past precedents because there was no past precedent -- the December 2006 licensing decision represented the Board's first written opinion on a license application. Because the licensing decision of the nascent Gaming Board was the first of its kind, we instead view as probative of this factor the existence of requirements that the record be transcribed, that the Board issue a written decision and final order, and that the Board employ "a cognizable burden of proof." <u>Cleavinger</u>, 474 U.S. at 206.

---

4 Judge Fisher, our dissenting colleague, suggests that even though the Board members serve for a set term of years, they are still subject to political pressure to decide licensing applications in a particular way if they wish to ensure their reappointment. That line of reasoning would similarly deny elected state judges absolute immunity, a proposition that we cannot, and do not, endorse. <u>See</u> <u>Tobin for Governor v. Ill. State Bd. of Elections</u>, 268 F.3d 517, 526 (7th Cir. 2001); <u>Brown v. Griesenauer</u>, 970 F.2d 431, 439 (8th Cir. 1992).

Here, the Gaming Board is required by law to reach its decisions based on certain statutorily delineated criteria relating to each applicant's eligibility and suitability for licensing. 4 Pa. Cons. Stat. Ann. §§ 1302-1305, 1325(c); 58 Pa. Code § 441a.7(e)-(h). As we have noted, in determining whether each applicant has satisfied those criteria, the Board is required to employ a "clear and convincing evidence" standard. 58 Pa. Code § 441a.7(d). As is evident in the Board's written decision in this case, fulfillment of those criteria serves as a basis of comparison for deciding between the applicants. The Board also is mandated to issue a written decision accompanying its final order. We are satisfied that this factor also supports quasi-judicial immunity.

### 5. The adversarial nature of the process

The Butz Court recognized that certain facets of the adversarial process "enhance the reliability of information and the impartiality of the decisionmaking process": (1) "[a]dvocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court," (2) "jurors are carefully screened to remove all possibility of bias," and (3) witnesses are . . . subject to the rigors of cross-examination and the penalty of perjury." 438 U.S. at 512. In Dotzel, which we read as applying here, we found that the proceedings at issue were "adversarial as a matter of law" because (1) "all interested parties [must] be given notice and an opportunity to attend," (2) *ex parte* contacts were prohibited, (3) witnesses could be cross-examined, and (4) the parties could challenge proffered evidence. 438 F.3d at 327. The District Court here denied immunity to the Board Defendants because Keystone's averments, which alleged that *ex parte* communication was permitted at the licensing hearings, among other averments, "cast substantial doubt as to the adversarial nature of the proceedings." Keystone, 674 F. Supp. 2d at 629.

21

We observe that in applying for a license to the Gaming Board, almost all of the adversarial elements this Court identified in <u>Dotzel</u> are met at Gaming Board licensing hearings. The applicants must be given "reasonable notice of a hearing and an opportunity to be heard," 2 Pa. Cons. Stat. § 504; are entitled to object to rulings made by the Board in competitors' hearings as well as their own, 58 Pa. Code § 441a7(t); and may challenge competitors' evidence and applications by presenting comparative evidence, briefs, and oral argument, <u>id.</u> § 441a7(n), (u), (w). In addition, Gaming Board members are largely proscribed from *ex parte* communications, participation in which is usually grounds for recusal, 4 Pa. Cons. Stat. § 1202.1(c), (c.1), (c.2), although such communications are permitted 1) between the Board and certain executive officers to the extent necessary to clarify or correct evidentiary materials or 2) between the Board and the office of chief counsel of the BIE. <u>Id.</u> § 1202.1(e).

Contrary to the District Court's determination, those limited exceptions to the blanket ban on *ex parte* contacts do not affect the Board members' eligibility for quasi-judicial immunity. <u>See, e.g.</u>, <u>Brokaw v. Mercer Cnty.</u>, 235 F.3d 1000, 1015-16 (7th Cir. 2000); <u>J.R. v. Wash. Cnty.</u>, 127 F.3d 919, 925-26 (10th Cir. 1997).

Keystone also identifies two hallmarks of the adjudicatory process that are absent from licensing proceedings before the Gaming Board. First, Keystone claims that an applicant is not entitled to test the veracity of background information relating to each applicant, which the Board may consider in reaching its determination. 58 Pa. Code § 441a7(r). That concern, however, is tempered by the requirements that the Board must give notice of the contents of any non-confidential information, 4 Pa. Const. Stat. § 1206(g); "[t]he Board may request that an applicant respond to inquiries related to confidential information during a licensing hearing to promote transparency in the regulation of gaming in this Commonwealth," 58 Pa. Code § 441a7(r); and

the applicant may object to any ruling by the Board, id. § 441a.7(t).

It is undisputed that applicants here have no right to cross-examination. Some courts have concluded that while the absence of a right to cross-examination may support a finding that a given proceeding is non-adversarial, see Cleavinger, 474 U.S. at 206, this does not determine the issue. In considering the requirement for permitting cross-examination in order to immunize officials under the quasi-judicial status asserted here by the Board Defendants, our sister circuits have held that the other factors of weighing evidence, issuing written decisions, administering oaths, and the like, are sufficient. See Beck v. Tex. State Bd. of Dental Exam'rs, 204 F.3d 629, 636 (5th Cir. 2000) (holding that state dental board disciplinary proceedings were adversarial, thus supporting finding of quasi-judicial immunity for board members, because dentist had rights to present evidence and to counsel, and board administered oaths to witnesses and made evidentiary rulings); Dunham v. Wadley, 195 F.3d 1007, 1011 (8th Cir. 1999) (concluding that members of veterinary licensing board were entitled to immunity, without mentioning whether right of cross-examination existed at licensing hearings, because "board weighed evidence, made factual determinations, determined sanctions, and issued written decisions"); see also Franklin v. Shields, 569 F.2d 784, 796, 798 (4th Cir. 1977) (deciding pre-Butz that members of parole board were entitled to quasi-judicial immunity even though prisoners did not have rights to call or cross-examine witnesses at parole hearings).

Moreover, not every Butz factor must be satisfied for an official to be entitled to quasi-judicial, absolute immunity. Miller v. Davis, 521 F.3d 1142, 1145 (9th Cir. 2008); Beck, 204 F.3d at 635 (noting that when analyzing Butz factors, "[n]o one factor is controlling"). It follows that the District Court erred by denying the Board members immunity on the

23

basis of considerations related to the adversariness factor alone. See Keystone, 674 F. Supp. 2d at 659,

### 6. The availability of appellate review

In Dotzel, this Court recognized that "[a] formal appellate procedure is probably the single most court-like feature a government body can have," explaining that many of the procedural safeguards integral to the quasi-judicial immunity analysis "exist largely to facilitate appellate review," and noting that "it is a hallmark of courts, unlike legislature and executives, that (with one exception) they do not consider themselves to be either final or infallible." 438 F.3d at 327. We agree.

Under 4 Pa. Cons. Ann. § 1204, unsuccessful gaming license applicants may appeal as of right to the Pennsylvania Supreme Court; that Court, in turn, "shall affirm all final orders, determinations or decisions of the board . . . unless it shall find that the board committed an error of law or that the order determination or decision of the board was arbitrary and there was capricious disregard of the evidence." To facilitate any appeal, the Board must transcribe the hearings, 58 Pa. Code § 441a.7(v), and issue a written decision, id. § 441a.7(x). It is clear that Keystone had a right to appeal the Gaming Board's decision to the Pennsylvania Supreme Court, which it chose not to exercise. Therefore, as the District Court similarly concluded, Keystone, 674 F. Supp. 2d at 659, this factor also supports immunity for the Board Defendants. [5]

---

[5]  In Riverwalk Casino, LP v. Pa. Gaming Control Bd., 926 A.2d 926, 935 (Pa. 2007), the Supreme Court of Pennsylvania held, as we have noted earlier, that the Pennsylvania Gaming Control Board (the Board Defendants here) is a quasi-judicial body. Therefore, under the authority of Butz, 438 U.S. 478, the members of that body would be entitled to absolute immunity from personal liability.

24

In sum, we hold that the Butz factors, on balance, clearly support quasi-judicial immunity for members of the Pennsylvania Gaming Control Board.

## B.

Finally, we disagree with the District Court's conclusion that additional factual development is necessary. As we acknowledged in Dotzel, deciding whether to extend quasi-judicial immunity to an official involves a "legal determination" that focuses on "the legal and structural components of the job function, as opposed to detailed facts about specific acts and mental states." 438 F.3d at 325. Here, as in Dotzel, it is evident that, based on the relevant statutory and regulatory provisions governing Gaming Board hearings, the Board serves a quasi-judicial function, which entitles a Board member to "*immunity from suit* rather than a mere defense to liability." Mitchell, 472 U.S. at 526.

We conclude that an overall consideration and weighing of the factors required by Butz to establish quasi-judicial, absolute immunity for the licensing decisions of the Board Defendants have been more than met. In light of our conclusion, we need not reach or address the parties' arguments concerning qualified immunity.

## IV.

We will reverse the decision of the District Court and direct that the District Court on remand enter an order dismissing all counts against the Board Defendants.

FISHER, *Circuit Judge*, concurring and dissenting.

Though I agree with the judgment to reverse and remand the District Court's decision, I disagree with my colleagues' broad interpretation of quasi-judicial immunity. I therefore write separately.

The majority holds that the Pennsylvania Gaming Control Board's ("Board") decision to grant two Category 2 gaming licenses was a judicial act subject to absolute immunity. This expands the notion of "judicial." The Supreme Court has "been quite sparing in [its] recognition of absolute immunity, . . . and h[as] refused to extend it any further than its justification would warrant." *Burns v. Reed*, 500 U.S. 478, 486-87 (1991) (quotation marks and citations omitted). Today's decision exceeds the traditional limitations of absolute immunity, creating another barrier to the remedies secured by Section 1983 for deprivations of constitutional rights.

I would instead decide this case on the ground of qualified immunity and hold that the Board members did not deprive Keystone of a well-established constitutional right. For this reason, I agree with our decision to reverse the District Court. But we need not expand the narrow contours of absolute immunity to reach this result. "Absolute immunity . . . is strong medicine, justified only when the danger of [officials' being] deflect[ed from the effective performance of their duties] is very great." *Forrester v. White*, 484 U.S. 219, 230 (1988) (quotation marks and citation omitted) (modifications in original). There is little reason to hold that the Board members, and similarly-situated executive officials, "may with impunity discharge their duties in a way that is known to them to violate the United States

Constitution or in a manner that they should know transgresses a clearly established constitutional rule." *Butz v. Economou*, 438 U.S. 478, 507 (1978).

**I.**

Keystone brings this action under 42 U.S.C. § 1983, which is written in broad terms. A decision to grant the Board absolute immunity must comport with Section 1983. It applies to "[e]very person" acting under color of state law who deprives any other person in the United States of "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Absolute immunity is nowhere mentioned in the statute, but it was "solidly established at common law" at the time of passage. *Pierson v. Ray*, 386 U.S. 547, 553-54 (1967). The "legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities." *Id*. at 554. Absolute immunity therefore rests upon a finding that Congress did not intend to abrogate the common-law traditions. In deciding whether immunity applies, "our role is to interpret the intent of Congress in enacting § 1983, not to make a freewheeling policy choice." *Malley v. Briggs*, 475 U.S. 335, 342 (1986); *see also Burns*, 500 U.S. at 497 (Scalia, J., concurring and dissenting) (stating that "we have . . . thought a common-law tradition (as of 1871) to be a . . . *necessary* one" for absolute judicial immunity under § 1983 (emphasis in original)); *Tower v. Glover*, 467 U.S. 914, 920 (1984) ("If an official was accorded immunity from tort actions at common law when the Civil Rights Act was enacted in 1871, the Court next considers whether § 1983's history or purposes

2

nonetheless counsel against recognizing the same immunity in § 1983 actions."). At the time of passage, "the touchstone for [absolute immunity's] applicability was performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." *Burns*, 500 U.S. at 500 (Scalia, J., concurring and dissenting) (citing *Steele v. Dunham*, 26 Wis. 393, 396-97 (1870); *Wall v. Trumbull*, 16 Mich. 228, 235-37 (1867); *Barhyte v. Shepherd*, 35 N.Y. 238, 241-42 (1866)); *see also Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435-36 (1993).

Absolute judicial immunity was extended to administrative bodies in *Butz*, 438 U.S. 478. But it was only extended to administrative bodies that fulfill a judicial function. The Court established an exception to the "general rule [of qualified immunity] for executive officials charged with constitutional violations" in holding "that there are some officials whose special functions require a full exemption from liability." *Butz*, 438 U.S. at 508; *Forrester*, 484 U.S. at 227 ("[I]mmunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." (emphasis in original)).

The Board's decision to issue gambling licenses is fundamentally different from a judicial decision. Though steeped in formality, the discretionary act of issuing a gambling license to some of several applicants is not the fulfillment of a judicial function. The functional approach to quasi-judicial immunity requires that "[w]hen judicial immunity is extended to officials other than judges, it is because their judgments are 'functional[ly] comparab[le]' to

3

those of judges." *Antoine*, 508 U.S. at 436 (modifications in original) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 423 n.20 (1976)). To determine whether an act is "judicial," we must look to the "nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the [body] in [its] judicial capacity." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). The Board is directed by statute to base its decision upon "whether the issuance of a license will enhance tourism, economic development or job creation [and] is in the best interests of the Commonwealth." 4 Pa. Cons. Stat. Ann. § 1325(a). Exercising discretion to choose two of five applicants for a license, based on these policy reasons, is not a function "normally performed by a judge." Judges do not award licenses to competing applicants based on policy preferences. They do not invite public comments and conduct open meetings with members of the public. In holding otherwise, my colleagues' construction of absolute quasi-judicial immunity fails to conform to the common law traditions of absolute immunity.

Moreover, the decision fails to meet the "touchstone" of serving "the function of resolving disputes between parties, or of authoritatively adjudicating private rights." *Antoine*, 508 U.S. at 435-36 (quoting *Burns*, 500 U.S. at 500 (Scalia, J., concurring and dissenting)). The majority glosses over the fact that the proceedings before the Board were not adversarial. In previous cases finding quasi-judicial immunity, administrative bodies served a judicial function: they either resolved a dispute or authoritatively adjudicated

4

private rights.[1] For example, in *Butz*, the Department of Agriculture sought to revoke or suspend a business license by alleging that it failed to meet minimum financial requirements. 438 U.S. at 481. It was an adjudication between an agency and a private company in which the right to conduct business was in dispute. The closest case on point

---

[1] The majority opinion refers to two district court cases from the Ninth Circuit that involve a gaming commission but are not entirely on point. In a case similar in name but not in substance, the Nevada Gaming Commission initiated suspension proceedings against a gaming employee and denied him a license, revoking his work permit and frustrating "the right to be employed by a licensed establishment." *Rosenthal v. Nevada*, 514 F. Supp. 907, 911 (D. Nev. 1981); *see also Romano v. Bible*, 169 F.3d 1182, 1187 (9th Cir. 1999) (holding that the Nevada Gaming Commission was subject to absolute immunity because it was sufficiently adversarial in nature and adjudicated disciplinary proceedings against licensees). The Nevada Gaming Commission proceeding is a clear case of a dispute between parties and an authoritative adjudication of a right. The only case which can be construed to support the majority's holding is *Kraft v. Jacka*, 669 F. Supp. 333 (D. Nev. 1987), where the district court held that the Nevada Gaming Commission's decision to deny a gaming license was protected by absolute immunity *and* qualified immunity. The court applied both absolute and qualified immunity, thereby failing to resolve whether denying a license to operate a gaming facility is properly considered a judicial function.

5

from our Circuit is *Dotzel v. Ashbridge*, 438 F.3d 320 (3d Cir. 2006), where a board of supervisors denied an application for a zoning permit by applying a discrete set of legal requirements. We held that the board of supervisors was sufficiently judicial and granted it absolute quasi-judicial immunity. What, in part, distinguishes the board of supervisors in *Dotzel* from the Board in this case is that the board of supervisors adjudicated a private right, namely, the right to use one's land. Dotzel had a legal right to his land and sought to exercise his right to use it for mining purposes.

The Board, by contrast, did not adjudicate any private rights. Unlike the board of supervisors in *Dotzel*, the Board did not authoritatively determine what Keystone or any of the other four applicants could do with their property. Instead, the five applicants sought a privilege. Multiple businesses applied for two casino licenses, and the Board made a discretionary decision, based on policy determinations, to issue the privilege to some and not to others. It was akin to a government agency awarding contracts after a formal bidding process. The distinction between the board proceedings in *Dotzel* and the Board proceedings in this case is fundamental. In failing to take note of it, the majority risks an expansion of absolute immunity to government functions that are not properly regarded as judicial in nature.

I disagree with the majority's application of two additional *Butz* factors: the Board's insulation from political influence and its use of precedent in making decisions. An administrative body shares the characteristics of the judiciary if it is insulated from political influence. *See, e.g.*, *Butz*, 438

U.S. at 512. The majority concludes that "the Board is adequately insulated from political pressures." Maj. Op. at 22. In *Dotzel*, we stated that "the key question for our inquiry is . . . whether the Board members here can be removed from office based on the substance of their official work." 438 F.3d at 326. But in this case, the "for cause" provision is not the key question because the short appointment terms fail to insulate the Board members from political influence. The appointing authorities may decide not to reappoint Board members based on the substance of their work. The gubernatorial appointees serve terms of three years, and the legislative appointees serve terms of two years. 4 Pa. Cons. Stat. Ann. § 1201(d). This means that Board members are likely to mold the substance of their work to fit the political views of the appointing authorities.

We must also look to how the Board's decision-making procedures are structured to determine if it is insulated from political influence. Any action by the Board involving the "approval, issuance, denial or conditioning of any license . . . require[s] a qualified majority vote consisting of at least one gubernatorial appointee and the four legislative appointees." *Id*. § 1201(f)(1). This means that the "legislative appointees were granted what amounts to a veto power on the Board." *Riverwalk Casinos, LP v. Pa. Gaming Control Bd.*, 926 A.2d 926, 953 (Pa. 2007) (Castille, J., dissenting). The combination of the legislature's veto power on the Board and the two-year appointment term reveals that the legislature exerts indirect control over the Board's decisions.

7

Finally, the Board acts in an entirely discretionary manner and is not sufficiently bound by precedent or law to be regarded as judicial in nature. In *Dotzel*, we understood the question of whether precedent is used in resolving controversies to "be whether the Board's decisions are purely discretionary, or are constrained by outside law." 438 F.3d at 326-27. We paid notice that the board of supervisors was "required by statute to consider in its deliberations the land-use standards set out in the relevant zoning ordinance, and to explain its reasoning in written opinions." *Id*. at 327. The Board is required to issue written opinions, 4 Pa. Cons. Stat. Ann. § 441a.7(u), and to consider the basic eligibility of each applicant. *Id*. § 1325(b). Beyond this, though, the Board's decision is entirely discretionary. The Act states that the Board "may" base its decision on several factors:

> (1) The location and quality of the proposed facility, including, but not limited to, road and transit access, parking and centrality to market service area.

> (2) The potential for new job creation and economic development which will result from granting a license to an applicant.

> (3) The applicant's good faith plan to recruit, train and upgrade diversity in all employment classifications in the facility.

(4) The applicant's good faith plan for enhancing the representation of diverse groups. . . .

(5) The applicant's good faith effort to assure that all persons are accorded equality of opportunity in employment and contracting. . . .

(6) The history and success of the applicant in developing tourism facilities ancillary to gaming development if applicable to the applicant.

(7) The degree to which the applicant presents a plan for the project which will likely lead to the creation of quality, living-wage jobs and full-time permanent jobs for residents of this Commonwealth generally and for residents of the host political subdivision in particular.

(8) The record of the applicant and its developer in meeting commitments to local agencies, community-based organizations and employees in other locations.

(9) The degree to which potential adverse effects which might result from the project, including costs of meeting the increased demand for public health care, child care, public transportation, affordable housing and social services, will be mitigated.

(10) The record of the applicant and its developer regarding compliance with [Federal, State, and local labor laws.]

(11) The applicant's record in dealing with its employees and their representatives at other locations.

*Id*. §1325(c). In its sole discretion, the Board can base its decision on all, some, or none of the factors. In *Dotzel*, the board of supervisors was "required by statute to consider in its deliberations the land-use standards set out in the relevant zoning ordinance." 438 F.3d at 327. But the Gaming Act states that "[t]he board shall *in its sole discretion* issue, renew, condition or deny a slot machine license." 4 Pa. Cons. Stat. Ann. § 1325(a) (emphasis added). Furthermore, there is nothing directing the Board to consider its previous decisions. Though there were no prior decisions for the Board members to cite in the Board's Philadelphia licensing decision, there is nothing to indicate that the Board operates by use of precedent in making decisions. In fact, the highly discretionary nature of the proceedings indicates that decisions are to be made on a case-by-case basis. And this makes sense, given that the Board is not fulfilling a judicial function, but is applying policy preferences to determine the best applicants for casino licenses.

The general rule is to limit the application of absolute immunity to narrow circumstances and to apply qualified immunity to executive officials. *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) ("For executive officials in general . . .

10

our cases make plain that qualified immunity represents the norm."). *Butz* represents an exception for executive officials who fulfill a judicial function. The majority focuses on the formalities surrounding the Board's decision and fails to take note of the nature of the decision itself. Deciding the worthiest candidates for business licenses based on policy preferences is categorically not a judicial function. Following the majority's logic, as long as an executive officer's decision, whether it be issuing business licenses or granting contracts for paper supplies, is embedded in a sufficiently formal procedure, we must grant that officer absolute immunity. This is contrary to Supreme Court precedent, which requires us to look to "the nature of the act itself." *Stump*, 435 U.S. at 362. The Board members' position is that they are absolutely immune from any liability, even if they violate one's constitutional rights and they do so knowingly and deliberately. But in holding that the Board members are immune, the majority risks upsetting the protections embodied in Section 1983. "Under the criteria developed by precedents of th[e Supreme] Court, § 1983 would be drained of meaning were we to hold that the acts of a governor or other high executive officer have 'the quality of a supreme and unchangeable edict.'" *Scheuer v. Rhodes*, 416 U.S. 232, 248 (1974) (quoting *Sterling v. Constantin*, 287 U.S. 378, 397 (1932)).

> Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law: 'No man in this country is so high that he is above the law.' . . . In light of this principle,

11

. . . officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope.

*Butz*, 438 U.S. at 506 (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882)). The Board members fail to meet the burden of showing that "public policy requires an exemption" from such a foundational principle of governance. *Id.* For these reasons, I respectfully disagree with the majority's decision. The Board is not an exception to the rule of qualified immunity.

## II.

I believe that we should have decided this case on the ground of qualified immunity and held that the Board members did not deprive Keystone of a clearly-established constitutional right. Whether the Board members should receive qualified immunity is subject to a two-pronged test: a court evaluating a claim of qualified immunity "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). The test reflects "the balance that [the Court's] cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Davis v. Scherer*, 468 U.S. 183, 195 (1984). Keystone claims that the Board members violated its rights protected by the Commerce Clause and the

12

Equal Protection Clause. Neither claim of a constitutional deprivation was clearly established.[2]

Government officials who perform discretionary duties are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. This "generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time [the action] was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting *Harlow*, 457 U.S. at 819).

**A.**

Under the Commerce Clause, Congress has the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. This clause has an implied requirement—the Dormant Commerce Clause—that the states not "mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald*, 544 U.S. 460, 472 (2005)

---

[2] The two prongs of the qualified immunity test may be handled in any order. "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

(quotation marks and citation omitted).  In *Dennis v. Higgins*, the Court held that "individuals injured by state action that violates this [negative] aspect of the Commerce Clause may sue and obtain injunctive and declaratory relief" and that this "amounts to a 'right, privilege, or immunity' under [Section 1983]."  498 U.S. 439, 447 (1991).

Dormant Commerce Clause analysis consists of two steps: "whether 'heightened scrutiny' applies, and, if not, then . . . whether the law is invalid under the *Pike* [*v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970),] balancing test." *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 261 (3d Cir. 2006).  Heightened scrutiny applies when a law "discriminates against interstate commerce" in purpose or effect.  *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).  If heightened scrutiny does not apply, then we consider the *Pike* balancing test:  "whether the ordinance imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'"  *C & A Carbone, Inc.*, 511 U.S. at 390 (citing *Pike*, 379 U.S. at 142).

The Board stated in its written decision that it "considered the fact of competing Atlantic City properties as a negative factor for licensure in Philadelphia."  (App. at A194.)

> The Board finds it credible that owners of [Atlantic City] casinos . . . may attempt to use the Philadelphia property as a gambling-incubator to gain new customers who will then

14

be lured to its Atlantic City properties where it can earn a much larger profit on every dollar gambled. Likewise, the Board finds applicants without Atlantic City connections more strongly motivated to compete directly against the Atlantic City competition because they have no interest in diverting patrons to the casino which has a better tax structure for the casino.

(*Id*. at A194.) And it goes on to note why Keystone's ownership of a casino in Atlantic City serves as a negative factor.

Additionally, evidence has been introduced that the Trump Entertainment properties in Atlantic City[, the parent company of Keystone,] have undergone bankruptcy reorganizations in order to rebuild and revitalize them. The Board believes this further supports its decision to choose other applicants who do not have other facilities so close to Philadelphia which may lure patrons to Atlantic City to assist in the rebuilding and revitalization of properties there.

(*Id*. at A194.) The Board concludes by stating that it "finds that licensing casinos in Philadelphia which do not have common ownership with Atlantic City facilities are more likely to further the interests of the Commonwealth and the public which stands to benefit through increased revenues obtained by the Pennsylvania properties." (*Id*. at A194-95.)

15

The Board's decision meets both steps of Dormant Commerce Clause analysis. *First*, the Board did not discriminate against interstate commerce because it did not impose an absolute barrier to entry of any out-of-state casinos. *Cf. Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 40 (1980). In *Dean Milk Co. v. City of Madison*, the Court held that a denial of a license to sell milk in conformity with a scheme to exclude out-of-state milk "erect[ed] an economic barrier protecting a major local industry against competition from without the State" and "plainly discriminate[d] against interstate commerce." 340 U.S. 349, 354 (1951). Here, the Board did not erect a barrier to out-of-state competition. It merely considered Keystone's ties to Atlantic City as a negative factor—one of many factors it considered in the course of its decision. In fact, the two companies that received licenses had extensive out-of-state ties. HSP Gaming is headquartered in Delaware, and Foxwoods is affiliated with a company that owns a large gaming facility in Connecticut. Therefore, the Board's decision was unlike previous findings of discriminatory intent, where states established absolute barriers to interstate commerce.

*Second*, the Board's decision furthers important state interests that outweigh any incidental burdens on interstate commerce. The decision advanced four state interests: (1) the procurement of "a significant source of revenue to the Commonwealth"; (2) "provid[ing] broad economic opportunities to the citizens of th[e] Commonwealth"; (3) "prevent[ing] possible monopolization"; and (4) "enhanc[ing] the further development of the tourism market." 4 Pa. Cons. Stat. Ann. § 1102. States have a

16

legitimate interest "in maximizing the financial return to an industry within it." *Pike*, 397 U.S. at 143. Considering applicants' ties to Atlantic City as a negative factor due to concerns that it may draw customers away from the state does not constitute a "clearly excessive" burden on interstate commerce. *C & A Carbone, Inc.*, 511 U.S. at 390. The Board's decision does not inhibit Keystone or any other Atlantic City casino from attracting Pennsylvania customers. And it does not impose a heavy burden on out-of-state applicants for casino licenses, especially considering that the two successful applicants had significant out-of-state ties. Hence, the Board did not violate the Dormant Commerce Clause and did not deprive Keystone of a constitutionally-protected right.

The Board members should also be held immune because there was not "sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *McKee v. Hart*, 436 F.3d 165, 171 (3d Cir. 2006) (quotation marks and citation omitted). There is insufficient precedent that the mere consideration of a company's out-of-state ties as a negative factor—not a barrier—by an administrative agency violates the Dormant Commerce Clause, especially where the factors of site location and previous experience carried dispositive weight in determining the Board's decision. Hence, even if the Board's action did constitute a deprivation of a constitutional right, the lack of clarity in Dormant Commerce Clause jurisprudence prohibited the Board members from being on notice that the use of a negative factor in reaching a discretionary policy

17

determination deprived Keystone of its rights under the Commerce Clause.

**B.**

The Equal Protection Clause of the Fourteenth Amendment, § 1, directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This "does not forbid all classifications" but "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). The District Court held that Keystone "sufficiently alleged that the [Board] applied the Gaming Act in a way that was designed to benefit in-state business to the detriment of out-of-state competitors." *Keystone Redevelopment Partners, LLC v. Decker*, 674 F. Supp. 2d 629, 667 (M.D. Pa. 2009). The class of casinos with out-of-state ties is not a suspect class, and both parties agree that rational basis review should be applied.

Rational basis review requires us to consider whether "there is a plausible policy reason for the classification." *Nordlinger*, 505 U.S. at 11 (citation omitted). Two questions must be addressed: "first, whether at least one of the purposes of the classification involves a legitimate public interest and, second, whether the classification is rationally related to the achievement of that purpose." *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 237 (3d Cir. 1987). In making these determinations, we exercise deference and grant discretion to

18

the states.  *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979).

Keystone challenges the Board's use of the Atlantic City factor.[3]  As stated above, the Board advanced four purposes for the classification:  (1) "the procurement of a significant source of revenue to the Commonwealth"; (2) "providing broad economic opportunities to the citizens of th[e] Commonwealth"; (3) "preventing possible monopolization"; and (4) "enhancing the further development of the tourism market."  Appellant's Br. at 50-51.  These purposes derive from the Pennsylvania Race Horse Development and Gaming Act.  *See* 4 Pa. Cons. Stat. Ann. § 1102.

Purposes (1), (2), and (4) can be boiled down to the purpose of promoting domestic industry and the state revenue and tourism that will be derived therefrom.  Though states have an undoubtedly legitimate interest in raising revenue and

---

[3] The classification between Atlantic City casinos and non-Atlantic City casinos does not derive from legislation but is created by the Board in reaching its decision.  Rational basis review is usually conducted on legislative categories.  But it is nevertheless proper here.  In a slightly analogous case, a board was alleged to have "utilized an implicit classification in administering its zoning ordinance."  *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 821 (4th Cir. 1995).  There, the court conducted rational basis review of the category, which was created by the board.

promoting domestic commerce, it is not a "general rule that promotion of domestic industry is a legitimate state purpose under equal protection analysis." *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 876 (1985). The Board's aim of promoting domestic industry cannot be legitimate if it is "purely and completely discriminatory, designed only to favor domestic industry within the State." *Id.* at 878.

But the Board's aim was not solely to favor domestic industry within the State. One of the Category 2 licenses went to an out-of-state casino, and the other went to a casino with extensive out-of-state ties. In *Metropolitan Life*, the Court was concerned with a different form of discrimination: a state tax that was categorically higher for all out-of-state businesses. And since *Metropolitan Life*, the decision has been "sharply limited to its facts." *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 915 (3d Cir. 1990). Here, the Board was motivated by an interest in promoting local commerce, revenue, and tourism. Moreover, the Board had the legitimate purpose of reducing the possibility of local monopolization. Unlike *Metropolitan Life* where the state imposed a blanket impediment against interstate commerce, the Board weighed a factor against casinos located nearby based on concerns of local commerce. The Board's use of the Atlantic City factor is rationally related to the achievement of legitimate public interests, and it passes rational basis review.

## III.

I believe that the majority's broad construction of absolute quasi-judicial immunity is in conflict with Section

20

1983 and Supreme Court jurisprudence. The Board members are executive officials, and we should apply qualified immunity to their actions. For this reason, I respectfully disagree with my colleagues. But I concur in the judgment to reverse and remand the District Court's decision, believing that the Board members did not deprive Keystone of clearly-established constitutional rights.